UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAQUAVIUS DAVONTE TRAMBLE,

    Petitioner,                                    Civil Action No. 20-CV-11624

vs.                                                  HON. BERNARD A. FRIEDMAN

SHANE JACKSON,

    Respondent.
_____/

**<u>OPINION AND ORDER DENYING PETITIONER'S
APPLICATION FOR A WRIT OF HABEAS CORPUS</u>**

Petitioner in this matter has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in Genesee Circuit Court of second-degree murder, MICH. COMP. LAWS § 750.317, assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and possession of a firearm during the commission of a felony. MICH. COMP. LAWS § 750.227b. He was sentenced to 375 months to 50 years for the murder and assault convictions and a consecutive two years for the firearm conviction.

The petition raises two claims: (1) insufficient evidence was presented at trial to prove beyond a reasonable doubt that petitioner possessed the mens rea for the offenses, and (2) the trial court erroneously admitted prior-acts evidence. For the reasons stated below, the Court shall deny the petition

**I.** *Background*

The Michigan Court of Appeals summarized the facts of the case as follows:

> These cases arise out of a shooting on August 29, 2015 on Wisner Street in Flint that resulted in the death of Donnie Younger, Jr. and the injury of Deandrea Shields. The cases were tried jointly before two separate juries.

### A. WISNER STREET SHOOTING

On August 29, 2015, Tramble borrowed Aniesa Alley's car, a black Malibu. Alley, Tramble's girlfriend, lived in Davison, Michigan. Tramble drove Alley's Malibu to a McDonald's restaurant on Clio Road in Flint; his passengers were Keel-Haywood and Keel-Haywood's girlfriend, Sharlyn Dendy.

Several witnesses testified that they had attended a party on Pasadena Street in Flint, and that a group of party attendees left the party around midnight to go to the McDonald's on Clio Road. Tayonna Williams, a relative of both defendants, testified that she was at the party and rode with several other women, including Yamonie Williams (no relation to Tayonna, but a cousin of Younger), to the McDonald's in a truck driven by a woman whose name she did not know. At some point, Yamonie and the driver of the truck began to argue; Tayonna testified that someone called defendants to pick up Tayonna and her friends because the driver did not want them in her vehicle any longer.

Tayonna testified that by the time defendants and Dendy arrived at the McDonald's, Yamonie and the driver of the truck had begun physically fighting. Tramble left the Malibu to attempt to break up the fight. While Tramble and others were attempting to do so, someone retrieved a firearm from the trunk of a black Impala and fired it several times into the air. Several witnesses testified that the gun was fired by a man named James Reed or "JR." However, Reed testified that the shooter was an unknown man with whom he and two others had ridden to the McDonald's in the black Impala. After the gun was fired, everyone in the parking lot ran to various vehicles and left the scene. Tayonna testified that Younger, Shields, Reed, and another unknown individual left in a silver Hyundai driven by Younger. However, Reed testified that he left in the black Impala with several others, including the unknown man who had fired the gun in the parking lot. Yamonie, Tayonna, and Tracy Coleman got into the Malibu along with Dendy, Tramble, and Keel-Haywood and left the area with Keel-Haywood driving. As they drove away, Dendy testified that she heard Tramble say, "they was [sic] shootin' at us" and "we need protection."

Yamonie and Dendy both testified that Keel-Haywood drove the Malibu to Tramble's grandmother's house. Defendants exited the Malibu, went into the house briefly, returned to the Malibu and resumed driving. Dendy testified that they were looking for a friend of theirs so that they could return her phone to her.

2

As the Malibu driven by Keel-Haywood was traveling southbound on Wisner Street, Yamonie and Dendy testified that they saw Younger's silver Hyundai approaching them northbound on Wisner Street. Yamonie heard one of defendants say, "look, there they go." Tayonna testified that Keel-Haywood parked the Malibu on the corner of Wisner Street and Dartmouth Street; after parking, defendants exited the Malibu and walked to the other side of the street into someone's yard. Tayonna testified that she knew defendants were carrying handguns because she had seen them while riding in the Malibu. Dendy took over driving the Malibu, leaving defendants behind. Yamonie testified that, as they drove off, she saw one of defendants with a gun; she believed it was Tramble. Yamonie testified that after that she "put [her] head down" because she "knew they was goin' shoot [sic] each other." Yamonie heard gunshots as they drove away, but did not see the actual shooting. Dendy also heard gunshots. Tayonna heard a "crash" as they drove away.

Shields testified that he was a passenger, along with two others, in the Hyundai driven by Younger. Shields testified that as they traveled north on Wisner Street, he heard several gunshots and heard bullets hitting the Hyundai. The window next to Shields broke and glass got into his eyes and cut his face; Shields initially believed that he had been shot. The Hyundai crashed into a light pole. Shields and the other occupants ran from the Hyundai, but Younger was unresponsive. Shields was later treated at a hospital for cuts and glass in his face and eyes.

Flint Police and Michigan State Police officers who arrived at the scene found the crashed Hyundai under a still-live electrical wire; it was deactivated by a Consumer's Energy employee. Younger had been shot in the back of the head and killed. The vehicle had been hit by at least five bullets. Nine Winchester brand 9mm Luger caliber shell casings were found near the crash site on Wisner Street. A Michigan State Police firearms expert testified that all of the casings had been fired from the same weapon. A fired bullet found at the scene was of the caliber class that included 9mm Luger. A lead fragment of a bullet removed from Younger's brain could not be matched to a particular caliber.

Shortly after Dendy drove off in the Malibu, she received a phone call from Tramble and drove back to the area to pick up defendants. Tramble drove the Malibu and its occupants back to Alley's house in Davison, where they all spent the night. Yamonie testified that while at Alley's house, she learned from Facebook that Younger had been

shot–although she did not learn whether he was alive or dead—and she began crying. She testified that Tramble took her aside and said, "I know that's your cousin" and "I'm sorry" or something like that. Yamonie went to the police a few days later.

Lieutenant Jason Cate was the officer in charge of the homicide case. After Lieutenant Cate interviewed Yamonie and Tayonna, Flint Police arrested defendants and Dendy. Lieutenant Cate interviewed both defendants shortly after the incident. Tramble was re-interviewed by Special Agent David Dwyre of the Michigan Department of Attorney General in 2016. Tramble initially told Special Agent Dwyre that Keel-Haywood shot at the Hyundai before it crashed; however, he later stated that he believed the occupants of the Hyundai were shooting at him, so he shot at the Hyundai "once or twice" before the crash.

Tramble also gave a video-recorded statement to Lieutenant Cate and Detective-Sergeant Jeffrey Hook of the Michigan State Police in 2016, portions of which were played only for Tramble's jury; a redacted transcript of that statement was also entered as an exhibit before Tramble's jury. In that statement, Tramble said that he and Keel-Haywood had retrieved guns from a house after the McDonald's shooting, and that both of them had shot at the Hyundai; however, he stated that he fired his gun only after someone had exited the Hyundai and started shooting at him. Tramble also stated that Keel-Haywood had informed him that he should shower to "wash the gunpowder and stuff" off and that "[he] was like, piss on your hands and all that." Both defendants showered and changed clothes after the incident, and Keel-Haywood disposed of the shoes and clothes they had been wearing. . . .

## B. OTHER-ACTS EVIDENCE

### 1. BEFORE BOTH JURIES

Alley testified before both juries that she went to a block party on Dartmouth Street in the summer of 2015, driving defendants and Dendy there in her Malibu. She observed both defendants armed with firearms in their front pockets. Alley left the party briefly; when she returned, she learned that there had been a shooting and that a man had been shot. Alley testified that after the shooting she drove defendants to Keel-Haywood's aunt's house, where defendants changed clothes.

Dendy also testified that she attended the party and heard gunshots,

but that she did not see either defendant with a gun or anyone from the party firing guns.

A firearms examiner from the Michigan State Police testified and opined, based on his examination, that two 9mm shell casings recovered from the Dartmouth Street shooting had been fired from the same weapon as the nine shell casings recovered from the Wisner Street shooting.

* * *

### 3. BEFORE TRAMBLE'S JURY ONLY

Before Tramble's jury only, Alley testified that "[e]very time [defendants] get into something that they're not supposed to, they always go and change their clothes" because of "the gun residue on their stuff, they just throw them [sic] clothes away." In the video and transcript of Tramble's 2016 statement, he related an earlier incident involving a shooting at a block party on Dartmouth Street. Tramble stated that someone in a car shot at the party-goers, and that people, including Keel-Haywood, fired back; Tramble admitted that he had a gun, but denied firing it that night. Tramble stated that after the shooting Keel-Haywood cleaned himself up in the same manner as he had done after the Wisner Street shooting, but that he (Tramble) had not. Again, this statement was only heard by, and the transcript only provided to, Tramble's jury.

*People v. Tramble*, No. 338949, 2018 WL 6517570, at *1-3 (Mich. Ct. App. Dec. 11, 2018) (footnotes omitted).

On appeal, petitioner raised these claims:

I. Appellant was denied due process when he was convicted of second-degree murder and assault with intent to murder where the prosecutor failed to prove that he acted or encouraged, as wither a principle or an aider and abettor, the shootings of the decedent and complainant.

II. The trial judge abused his discretion in permitting the prosecution, over a defense objection, to present evidence of appellant's alleged involvement in an unrelated shooting that occurred two weeks earlier, pursuant to MRE 404(b), as that evidence did not sufficiently support the prosecution's position that it proved his identity due to a common modus operandi and the minimal probative value of the evidence was

5

>substantially outweighed by its inherently prejudicial impact on the verdict.
>
>III. The trial court erroneously assessed appellant 25 points under Offense Variable 3, thereby increasing the recommended range for the minimum sentence, and entitling him to a resentencing.

The Michigan Court of Appeals affirmed in an unpublished opinion. *Id*. Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims as in the Michigan Court of Appeals. The Michigan Supreme Court denied the application by form order. *People v. Tramble*, 929 N.W.2d 336 (Mich. 2019) (Table).

## II. *Legal Standards*

Under 28 U.S.C. § 2254(d), a habeas petitioner must demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court law. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. Under this standard, a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**III. *Discussion***

**A. *Sufficiency of the Evidence***

Petitioner's first claim asserts that constitutionally insufficient evidence was presented at trial to establish beyond a reasonable doubt that he killed Younger and assaulted Shields with the required mens rea for the offenses of conviction. Respondent argues that the Michigan Court of Appeals reasonably rejected the claim on the merits, barring habeas relief under § 2254(d).

Under clearly established Supreme Court law, evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Taking the *Jackson* standard together with § 2254(d), two levels of deference apply to habeas review of sufficiency of the evidence claims adjudicated on the merits by a state court. *See Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009). First, this Court analyzes the claim under the *Jackson* standard, under which it may not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* at 205. Second, this Court defers "to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*; *see also Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). In addition, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

After reciting the elements for the offenses of conviction and the established constitutional standard, the Michigan Court of Appeals concluded that a rational fact finder could have found the elements of the offenses were proven beyond a reasonable doubt:

Tramble argues that the evidence demonstrates that, at best, he was merely present when Keel-Haywood shot at the Hyundai. Tramble ignores his statement to Special Agent Dwyre in which he admitted that he fired at the Hyundai occupied by Younger and Shields. Although Tramble asserted in his interview with Dwyre that he had been fired upon first, no evidence was found that any weapons had been fired from the Hyundai. Further, Tramble's letters strongly imply that he shot at the Hyundai, even if he believed that it was in self-defense.[7] A jury could have found from Tramble's own statements that he was the shooter and possessed the requisite intent to kill for second-degree murder by setting in motion a force likely to cause death or great bodily harm. *Roper*, 286 Mich. App. at 84, and the intent to kill for AWIM [assault with intent to murder] by his use of an instrument and means adapted to produce death. *Taylor*, 422 Mich. at 558.

Further, the evidence demonstrates that Tramble was not merely present at the scene. Even if the jury did not believe that Tramble fired the gun that killed Younger and injured Shields, and even without considering his statements acknowledging that he had fired a gun at the Hyundai, his acts—including allowing Keel-Haywood to drive his girlfriend's Malibu, leaving the Malibu with Keel-Haywood and moving with him to another location, returning to the Malibu, changing his clothes at Keel-Haywood's aunt's house and allowing Keel-Haywood to dispose of his clothes, and staying overnight with Keel-Haywood at Alley's house—show that he was far more than "merely present" when Keel-Haywood committed the acts charged. A rational jury, viewing the evidence in the light most favorable to the prosecution, *Reese*, 491 Mich. at 139, could have concluded that Tramble "performed acts or gave encouragement that aided and assisted the commission of the crime" and "intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement." *People v. Smielewski*, 235 Mich. App. 196, 207; 596 N.W.2d 636 (1999).

---

[7] Tramble did not present a self-defense theory at trial and does not argue self-defense on appeal.

*Tramble*, 2018 WL 6517570, at *7-8.

This decision was not objectively unreasonable. "The elements of second-degree murder under Michigan law are: (1) a death, (2) caused by an act of the defendant, (3) with malice,

and (4) without justification or excuse." *Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010) (citing *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998)). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Stewart*, 595 F.3d at 654 (citing *People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980)). "[T]he crime of assault with intent to commit murder requires proof of three elements: '(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 581 N.W.2d 753, 759 (Mich. Ct. App. 1998).

"[T]o establish that a defendant aided and abetted a crime, a prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended to commit the crime at the time he gave aid and encouragement." *Riley v. Berghuis*, 481 F.3d 315, 322 (6th Cir. 2007) (citing *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999)). "Factors that may be considered [in evaluating defendant's knowledge and intent] include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Thomas v. Stephenson*, 898 F.3d 693, 699 (6th Cir. 2018) (quoting *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999)). "Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *People v. Norris*, 600 N.W.2d 658, 663 (Mich. Ct. App. 1999). "However, . . . [i]n evaluating a 'mere presence' defense, a

fact-finder must distinguish, based upon the totality of the circumstances, between one who is merely present at the scene and one who is present with criminal culpability." *Long v. Stovall*, 450 F. Supp. 2d 746, 753-54 (E.D. Mich. 2006).

In the present case, the state court reasonably concluded that, viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented at trial to lead a rational fact-finder to conclude beyond a reasonable doubt that petitioner possessed the necessary mental state for second-degree murder and assault with intent to commit murder either as the principal or as an aider and abettor. Petitioner does not contest the fact that he was present at the scene with his co-defendant at the time of the fatal shooting. He asserts, however, that there was no evidence presented at trial that he knew that his co-defendant was going to shoot the victims or that he shared that intent.

This argument assumes that the jury accepted the theory that Keel-Haywood was the shooter. In fact, however, there was substantial evidence presented at trial, including petitioner's own statements to the police, that petitioner shot at the victims' car. The evidence indicated that after the shooting at the McDonald's, petitioner and Keel-Haywood drove to petitioner's grandmother's house to retrieve firearms. (ECF No. 5-16, at 134; ECF No. 5-17, at 58-61.) Dendy-Keel (Haywood's girlfriend) heard petitioner say that they went there because they needed "protection." (ECF No. 5-17, at 58, 66, 113.)

As the two men were driving around with Dendy and three other women on Wisner Street, they saw the victims' car coming in the opposite direction. (ECF No. 5-16, at 64, 138, 155, 156; ECF No. 5-17 at 62, 67, 68, 103,138.) One of the defendants said, "there they go," and the two men got out of the car. (ECF No. 5-16, at 60, 62, 98, 139.) Tayonna Williams recalled both

defendants being armed with guns when they exited the car. (ECF No. 5-16, at 100, 105, 110-111.) Yamonie Williams, meanwhile, recalled seeing only Keel-Haywood with a gun. (*Id*., at 142, 148). The defendants walked into an adjacent yard. (ECF No. 5-16, at, 99, 147-148, 153-54; ECF No. 5-17, at 70, 114.)

Dendy climbed up into the driver's seat, and the four women drove past the oncoming victims' car. (ECF No. 5-16, at 63-64, 101; ECF No. 5-17, at 78, 107.) The women then heard gunshots and saw flashes, but they did not see who was doing the shooting. (ECF No. 5-16, at 65, 141, 143, 155; ECF No 5-17 at 76-77, 79, 107.) They heard the other car crash as they drove away from the scene. (ECF No. 5-16, at 101-102, 113-114.)

The surviving victim, Deandrea Shields, testified that he was riding with Donnie Younger, Kiki Jones, and Abdulla on Wisner Street when their car was shot-up. (ECF No. 5-16, at 191-192; ECF No. 5-17, at 13-19.) Shields saw a shadow moving on the side of the street just before the shooting. (ECF No. 5-16, at 191-192; ECF No. 5-17, at 13.) Younger sped up, and Shields heard gunshots hitting the car. (ECF No. 5-17, at 14.) Shields testified that the rear driver-side window shattered, and glass cut his face and flew into his eyes. (ECF No. 5-17, at 15, 18-19, 22.) The car crashed into a light pole. (*Id*., at 15, 17.) Jones pulled him out of his seat and they ran away from the scene, while Younger remained unresponsive in the car. (*Id*., at 15-16, 18.) Shields testified that no one in their car had a gun. (*Id*., at 20.)

A crime lab technician collected nine fired cartridge casings grouped together in the same area on Wisner Street. (ECF No. 5-14, at 120, 126.) Officers searched the entire area, but they did not find any other shell casings. (*Id*. at 126, 128.) An expert opined that all the casings came from the same weapon. (ECF No. 5-17, at 151, 158.) The bullet that was recovered from Younger's

head matched the caliber of the casings. (*Id*.) The vehicle had been struck by five rounds. The window had been rolled up when it was impacted. (ECF No. 5-18, at 27.) The medical examiner testified there was no gunshot residue anywhere on the deceased's body to suggest that he had fired a gun. (*Id*. at 173.)

Petitioner made two statements to the police. While he gave an exculpatory account of his actions in the bulk of both statements, he also made several significant admissions. Petitioner admitted in his first statement that he and Keel-Haywood retrieved guns after the McDonald's shooting. (ECF No. 5-26, App. 1 at 16.) He also admitted to shooting at the victims' car, albeit in response to gunfire coming from that car. (*Id*. at 24-27.) Petitioner further admitted that he showered right after the shooting to remove gunpowder residue from his body. (*Id*. at 42.) Petitioner said that Keel-Haywood disposed of the clothes they wore during the shooting. (*Id*. at 42.)

In his second statement to an investigator from the Michigan Attorney General, petitioner again admitted that he returned fire on the victims' car after it crashed. (ECF No. 5-19, at 41.) But after the investigator confronted petitioner with the fact that no casings were recovered by the victims' car, petitioner changed his story and said that as the victims' car drove past him, he saw a flash of light inside the car, so he shot at the car once or twice before it crashed. (*Id*., at 41, 46.) There were no fired casings or other physical evidence that shots had been fired from inside the victims' vehicle. (ECF No. 5-21, at 9.)

The evidence presented at trial viewed most favorably to the prosecution supported a finding that petitioner possessed the request mental states for second-degree murder and assault with intent to commit murder. Based on the evidence presented, the jury reasonably could have concluded beyond a reasonable doubt that after the McDonald's shooting, petitioner and

Keel-Haywood armed themselves and then sought out and located the people they thought responsible for the earlier shooting. Petitioner and Keel-Haywood then exited their own car and waited by the side of the road for the victims' car to pass. As it did, petitioner fired multiple shots at the victims' car, killing Younger and injuring Shields. Petitioner's admission that he fired shots, when taken together with the physical evidence suggesting that only one weapon was fired at the scene, allowed the jury to conclude beyond a reasonable doubt that petitioner was the sole shooter. Obviously, if the jury found that petitioner fired multiple rounds into an occupied vehicle from relatively close range, they could conclude that his intention was to kill one or more of its occupants.

Applying the requisite doubly deferential standard of review to petitioner's claim, the Michigan Court of Appeals reasonably determined that the evidence presented at trial allowed a rational fact-finder to conclude beyond a reasonable doubt that petitioner possessed the required mental states for the offenses of conviction. Petitioner's sufficiency-of-the-evidence claim is therefore without merit.

**B.** *Admission of Evidence that Gun was Illegally Obtained*

Petitioner's second claim asserts that the trial court erred when it allowed the prosecutor to introduce testimony regarding another shooting involving Keel-Haywood and petitioner in the same area of Flint. The Michigan Court of Appeals found that the evidence was properly admitting under state evidentiary rules. *Tramble*, 2018 WL 6517570, at *4-5 (citing MICH. R. EVID. 403 and 404(b)).

"Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

13

2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). A habeas petitioner bears the burden of demonstrating that a state court's ruling on a matter of evidence "contradicts Supreme Court precedent and violates a fundamental right." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007).

Petitioner has not pointed to clearly established Supreme Court law that creates a constitutional right protecting against the admission of other-acts evidence at trial. In fact, habeas courts have specifically found that such claims are essentially non-cognizable on federal habeas review because they cannot be supported by Supreme Court law. See *Dowling v. U.S.*, 493 U.S. 342, 352-53 (1990) (holding that admission at defendant's bank robbery trial of "similar acts" evidence that he had subsequently been involved in a house burglary for which he had been acquitted did not violate due process); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence").

In any event, the other-acts evidence at issue here was highly relevant to demonstrate petitioner's identity as one of the perpetrators. The evidence related to a shooting at a block party close to the location of the present shooting that had occurred a few weeks earlier. The other-acts evidence consisted of testimony indicating that petitioner and Keel-Haywood were in possession of guns at the party, that there were a number of guns fired at that party, and that among the weapons fired were two casings fired by the same gun that killed Younger. Ballistics evidence established that the same gun was used on both occasions. The fact that both defendants were present at each location and the same gun was used during each incident tended to prove that one of the two men was the shooter in the present case. The other-acts evidence was not introduced to show that petitioner was a bad person or had a propensity to commit shootings. Rather, it was used to show

that petitioner or Keel-Haywood had previously possessed and used the murder weapon in the present case. It was not fundamentally unfair to admit this other-acts evidence. Accordingly, petitioner's second claim fails because it cannot be supported by clearly established Supreme Court law and because the admission of the other-acts evidence did not render petitioner's trial fundamentally unfair.

As neither of petitioner's habeas claims merits relief, the Court shall deny the petition. The Court shall also decline to issue a certificate of appealability, as petitioner has failed to make a substantial showing that any of his constitutional rights have been violated. Accordingly,

IT IS ORDERED that petitioner's application for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that no certificate of appealability shall issue.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
Dated: March 15, 2021    SENIOR UNITED STATES DISTRICT JUDGE
Detroit, Michigan